## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

EMILIA JOSEFINA MORALES,  :
    :
    Plaintiff    :    No. 3:14-CV-2330
    :
  vs.    :    (Judge Nealon)
    :
CAROLYN W. COLVIN, Acting  :
Commissioner of Social Security,  :
    :
    Defendant    :

**FILED**
**SCRANTON**

MAR 0 2 2016

Per_____
DEPUTY CLERK

## MEMORANDUM

On December 8, 2014, Plaintiff, Emilia Josefina Morales, filed this instant appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI")[2] under Titles II and XVI of the Social Security Act, 42 U.S.C. § 1461 et seq. and U.S.C. § 1381, et seq., respectively. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's application for DIB and SSI will be affirmed.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

2. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] her applications for DIB and SSI on April 27,

2011, alleging disability beginning on June 17, 2010, due to Bipolar Disorder,

stomach problems, and panic attacks. (Tr. 124, 155, 157).[4]  The claim was

initially denied by the Bureau of Disability Determination ("BDD")[5] on September

20, 2011. (Tr. 94).  On October 26, 2011, Plaintiff filed a written request for a

hearing before an administrative law judge. (Tr. 104).  An administrative hearing

was held on February 13, 2013, before administrative law judge Michele Stolls

("ALJ"), at which Plaintiff, witness Edilma Rose Maylone, and an impartial

vocational expert Michele C. Giorgio ("VE") testified. (Tr. 45-90).  On April 8,

2013, the ALJ denied Plaintiff's claim. (Tr. 8-26).  On October 16, 2014, the

Appeals Council concluded that there was no basis upon which to grant Plaintiff's

request for review. (Tr. 1-3).  Thus, the ALJ's decision stood as the final decision

---

3. Protective filing is a term for the first time an individual contacts the Social
Security Administration to file a claim for benefits.  A protective filing date allows
an individual to have an earlier application date than the date the application is
actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by
Defendant as part of the Answer on March 2, 2015. (Doc. 10).

5. The Bureau of Disability Determination is an agency of the state which initially
evaluates applications for disability insurance benefits on behalf of the Social
Security Administration.

of the Commissioner.

Plaintiff filed the instant complaint on December 8, 2014. (Doc. 1). On March 2, 2015, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 9 and 10). Plaintiff filed a brief in support of her complaint on March 30, 2015. (Doc. 11). Defendant filed a brief in opposition on April 30, 2015. (Doc. 12). Plaintiff filed a reply brief on May 5, 2015. (Doc. 13).

Plaintiff was born in the United States on March 19, 1974, and at all times relevant to this matter was considered a "younger individual."[6] (Tr. 155). Plaintiff graduated from college, and can communicate in English. (Tr. 157-158). Her employment records indicate that she previously worked as a sales consultant, a customer service agent, and an office manager. (Tr. 182). The records of the SSA reveal that Plaintiff had earnings in the years 1999 through 2009. (138). Her annual earnings range from a low of ten thousand six hundred thirty-five dollars and forty cents ($10,635.40) in 1999 to a high of thirty-two thousand seven hundred seven dollars and thirteen cents ($32,707.13) in 2001. (Tr. 138). Her

---

6. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

total earnings during those ten (10) years were two hundred thirty thousand eighty-four dollars and eighteen cents ($230,084.18). (Tr. 138).

In a document entitled "Function Report - Adult" filed with the SSA, Plaintiff indicated that she lived in a house with friends. (Tr. 197). When asked how her injuries, illness or conditions limited her ability to work, Plaintiff stated:

> It is very difficulty for me to concentrate. It is also difficult for me to cope with the pressures that the work usually brings. I am unable to function under much pressure. My ability to get along with other people is also always very difficult to do. I must eventually leave the job because I cannot handle the work.

(Tr. 197). Plaintiff noted that she was able to prepare her own meals daily for about a half an hour and could perform light cleaning and laundry for about one (1) hour once or twice a week. (Tr. 198). Regarding her concentration and memory, Plaintiff needed special reminders to take care of her personal needs and to take her medicine. (Tr. 198). She had a hard time keeping track of her finances. (Tr. 199). She did not handle stress or changes in routine well. (Tr. 200). Socially, Plaintiff would go grocery shopping, but needed to be accompanied because she would get disoriented often. (Tr. 199). She liked to watch television and slept a lot. (Tr. 199). She did not spend time with others. (Tr. 199). She did not have problems getting along with family, friends,

neighbors, or others, but rather would leave a job because she couldn't "handle the pressure." (Tr. 200).

At her hearing on February 13, 2013, Plaintiff stated that a combination of mental conditions, including Bipolar Disorder, anxiety, panic attacks, and Schizophrenia, left her disabled and unable to perform any gainful employment. (Tr. 51). She initially testified that she had a daughter, whom was under the care of the daughter's father because Plaintiff was not mentally stable enough to take care of her. (Tr. 54-55). Plaintiff lived with her sister in the Dominican Republic for some time in 2011 in order for her sister to take care of her because of her mental health problems. (Tr. 56). At the time of the hearing, Plaintiff was living with her brother. (Tr. 66).

She was able to study the Bible with the Jehovah Witness on Saturdays and go to Catholic church on Sundays, with the church being "full" when she attended. (Tr. 58). She also was able to go out and preach with the Jehovah Witness about a year before the hearing, but stopped in order to attend group therapy counseling. (Tr. 59). Plaintiff also attended a program called "Destinations" three (3) days a week for six (6) hours a day, and was still doing so at the time of the hearing, in order to learn "daily skills." (Tr. 63). It was at this point in the hearing that Plaintiff's social worker, Edilma Rosa Maylone, came in to explain this program.

(Tr. 61-63). She also explained that she had met with Plaintiff "very few times, really, because sometimes she's very inconsistent." (Tr. 71). Plaintiff also attended the YMCA with friends a couple of days per week for exercise. (Tr. 68-69).

Regarding medications, at the time of the hearing, she was taking four (4) medications, including one (1) for insomnia that would sometimes help and sometimes would not. (Tr. 70-71). Plaintiff also explained that she had a lot of support from doctors and therapy, but that she only had two (2) women friends in Pennsylvania. (Tr. 73).

Plaintiff testified that a typical day included sleeping when she felt depressed , not sleeping when he had a lot of energy, and staying in her room in isolation. (Tr. 74). She would also use Facebook, and had more than one hundred (100) friends on Facebook. (Tr. 75). She would also email others, like her daughter. (Tr. 74-75).

When questioned why she felt she could not work, Plaintiff stated that it was tough for her to "keep up" when she didn't sleep, that sometimes she had too much energy that made her body feel tired, and that her medications gave her side effects. (Tr. 80).

Plaintiff testified that she had difficulty with remembering names and

6

keeping facts straight, but she always remembered to take her medication. (Tr. 81-82). She cried frequently, and even uncontrollably in the past at work, but felt she was getting better with that and not crying as much because she was learning coping skills. (Tr. 82). She occasionally still had panic attacks, but learned coping skills as to how to handle them, and only had trouble when driving outside of "the city." (Tr. 83-84). She had difficulty finishing projects. (Tr. 84).

## MEDICAL RECORDS

From April 14, 2010, through May 25, 2011, Plaintiff had six (6) appointments with Cryil Hardy, M.D., for her bipolar complaints. (Tr. 397-407). Plaintiff reported going to the gym five (5) days per week, having friends, functioning well at home, and doing housework. (Tr. 402-03, 405). She also denied medication side effects. (Tr. 402-03, 405, 407). Dr. Hardy noted that Plaintiff displayed good eye contact, coherent speech, average intelligence, good memory, clear sensorium, good insight, organized thought processes, a sad affect, a fluctuating mood, compliant and controlled behavior, good concentration, no sucidial/homicidal ideations, and no hallucinations or delusions. (Tr. 401-04, 406). He assigned a Global Assessment Functioning ("GAF")[7] score of seventy

---

7. The GAF score, on a scale of 1-100, allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. American Psychiatric Association

(70) and prescribed medication.  (Tr. 399, 407).

In May 2011, Dr. Hardy opined that: Plaintiff's conditions prevented her

---

(2000).  Diagnostic and Statistical Manual of Mental Disorders (4th ed., text rev.).
Washington, DC: Author.  A GAF score is set within a particular range if either
the symptom severity or the level of functioning falls within that range.  Id.  The
score is useful in planning treatment and predicting outcomes.  Id.  The GAF
rating is the single value that best reflects the individual's overall functioning at
the time of examination.  The rating, however, has two components: (1) symptom
severity and (2) social and occupational functioning.  The GAF is within a
particular range if either the symptom severity or the social and occupational level
of functioning falls within that range.  When the individual's symptom severity
and functioning level are discordant, the GAF rating reflects the worse of the two.
Thus, a suicidal patient who is gainfully employed would have a GAF rating
below 20.  A GAF score of 21-30 represents behavior considerably influenced by
delusions or hallucinations or serious impairment in communication or judgment
or inability to function in almost all areas.  Id.  A GAF score of 31-40 represents
some impairment in reality testing or communication or major impairment in
several areas, such as work or school, family relations, judgment, thinking or
mood.  Id.  A GAF score of 41-50 indicates serious symptoms or any serious
impairment in social, occupational or school functioning.  Id.  A GAF score of 51
to 60 represents moderate symptoms or any moderate difficulty in social,
occupational, or school functioning.  Id.  A GAF score of 61-70 indicates some
mild symptoms or some difficulty in social, occupational, or school functioning.
Id.  Recently, the American Psychiatric Association no longer uses the GAF score
for assessment of mental disorders due to concerns about subjectivity in
application and a lack of clarity in the symptoms to be analyzed.  Solock v. Astrue,
2014 U.S. Dist. LEXIS 81809, *14-16 (M.D. Pa. June 17, 2014) (citing Ladd v.
Astrue, 2014 U.S. Dist. LEXIS 67781 (E.D. Pa. May 16, 2014)); See Am.
Psychiatric Assoc., Diagnostic and Statistic Manual of Mental Disorders 5d, 16
(2013).  As a result, the SSA permits ALJs to use the GAF score as opinion
evidence when analyzing disability claims involving mental disorders; however, a
"GAF score is never dispositive of impairment severity," and the ALJ, therefore,
should not "give controlling weight to a GAF from a treating source unless it is
well[-]supported and not inconsistent with other evidence."  SSA AM-13066 at 5
(July 13, 2013).

from working from May 3, 2011 through May 3, 2012; she need ongoing medication management to function well in the community; her symptoms continued to recur due to her noncompliance with treatment; and she was "not mentally stable to work at this time." (Tr. 454-56). He also noted that Plaintiff had Schizophrenia and a GAF of sixty (60). (Tr. 458). In his opinion, Plaintiff's mental condition moderately restricted her ability to perform activities of daily living and maintain social functioning; often caused difficulties in maintaining concentration, persistence, or pace; and resulted in one (1) or two (2) episodes of decompensation, each of extended duration (Tr. 458).

On June 21, 2011, B. Dalton, Psy.D., a state agency mental health consultative examiner, opined that Plaintiff's mental impairments mildly restricted her ability to perform activities of daily living; moderately impaired her ability to maintain social functioning and concentration, persistence, or pace; and caused one (1) or two (2) episodes of decompensation, each of extended duration (Tr. 418-28). Dr. Dalton noted that Plaintiff could meet the basic mental demands of simple work, but she would likely work best in a low-stress environment with limited social contacts. (Tr. 430, 434).

Plaintiff underwent outpatient mental health treatment at Northeast Counseling Services from August of 2011 through April of 2012. (Tr. 461-70).

At her initial psychiatric evaluation, Plaintiff stated that she was "doing well with the medication that she [was] on," denied current problems or medication side effects, and stated she was "helping her brother out." (Tr. 463-64). Psychiatrist Nilesh Baxi, M.D., noted that Plaintiff appeared calm and cooperative with good eye contact, adequate psychomotor activity, adequate (although occasionally guarded) speech, a euthymic mood, a constricted affect, normal orientation, poor insight, and no suicidal/homicidal ideations, paranoia, or hallucinations. (Tr. 463). He assigned a GAF of fifty-five (55), recommended the Outpatient Program, and continued Plaintiff on her prior medications. (Tr. 464).

Over the next eight (8) months, Plaintiff attended six (6) medication management visits, one (1) with Dr. Baxi and five (5) with physician's assistant Dorothy Perillo, PA-C ("PA Perillo"). (Tr. 465-70). Dr. Baxi and PA Perillo's notes report generally normal mental status findings and that Plaintiff denied medication side effects and reported improvement in her symptoms with medication. (Tr. 465-470). Plaintiff was repeatedly assigned GAF scores of fifty-five (55). (Tr. 465-70).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of
Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55
F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's
findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those
findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d
1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).
Factual findings which are supported by substantial evidence must be upheld.  42
U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where
the ALJ's findings of fact are supported by substantial evidence, we are bound by
those findings, even if we would have decided the factual inquiry differently.");
Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the
Secretary must be accepted as conclusive by a reviewing court if supported by
substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe
v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520,
1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of
evidence, but 'rather such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565
(1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

11

Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir.

12

1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an

13

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

work in the national economy. Id. As part of step four, the Commissioner must

determine the claimant's residual functional capacity. Id. If the claimant has the

residual functional capacity to do his or her past relevant work, the claimant is not

disabled. Id. "The claimant bears the ultimate burden of establishing steps one

through four." Residual functional capacity is the individual's maximum

remaining ability to do sustained work activities in an ordinary work setting on a

regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg.

34475 (July 2, 1996). A regular and continuing basis contemplates full-time

employment and is defined as eight hours a day, five days per week or other

similar schedule. The residual functional capacity assessment must include a

discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945;

Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that

which an individual is still able to do despite the limitations caused by his or her

impairment(s).").

   "At step five, the burden of proof shifts to the Social Security

Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of December 31, 2014. (Tr. 13). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from her alleged onset date of June 17, 2010. (Tr. 13).

At step two, the ALJ determined that Plaintiff suffered from the severe[8] combination of impairments of the following: "bipolar disorder, a schizoaffective disorder and a generalized anxiety disorder (20 C.F.R. 404.1520(c) and

---

8. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

416.920(c))." (Tr. 13).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (Tr. 14-15).

At step four, the ALJ determined that Plaintiff had the Residual Functional Capacity ("RFC") to perform work at all exertional levels. (Tr. 15-20). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the [RFC] to perform work at all exertional levels. However, her ability to work is reduced in that she is limited to occupations requiring no more than simple, routine tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions and in general, relatively few work place changes. She is also limited to occupations which require no more than occasional interaction with supervisors and co-workers, no tandem tasks with co-workers and no interaction with members of the general public, although she can be in proximity to the public. She is further limited to occupations which are low stress, defined as requiring occasional decision making required.

(Tr. 15).

At step five of the sequential evaluation process, the ALJ determined that, given Plaintiff's RFC, she was unable to perform any past relevant work, but that

16

considering her age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform. (Tr. 20).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between June 17, 2010, the alleged onset date, through the date of the ALJ's decision. (Tr. 21).

## DISCUSSION

On appeal, Plaintiff asserts the following arguments: (1) the ALJ did not accord proper weight to the testimony of Ms. Maylone, Plaintiff's case worker; (2) the ALJ did not accord proper weight to the opinion of Dr. Hardy; (3) the RFC is not supported by substantial evidence due to the ALJ's failure to include all relevant limitations; and (4) the ALJ committed "reversible error in failing to recontact Dr. Hardy as required by 20 C.F.R. § 404.1512(e)." (Doc. 11, pp. 5-21). Defendant disputes these contentions. (Doc. 12, pp. 13-26).

### 1.    Case Worker Ms. Maylone

Plaintiff argues that the ALJ failed to properly credit the testimony of Ms. Maylone, her case worker. (Doc. 9, pp. 6, 8-11). The ALJ gave only some weight to Ms. Maylone's limited testimony from the oral hearing that Plaintiff had been sporadically attending the Destinations Program, which was three (3) days a week for six (6) hours a day, because she was not an acceptable medical source and

because she admittedly had only limited interaction with Plaintiff for a short time. (Tr. 20, 70-71).

Social Security Regulation ("SSR") 06-3p states that an opinion given by a person who is not an acceptable medical source is "important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in this file," and that an ALJ must "ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-3p. When assessing a non-medical source opinion, SSR 06-3p states that the factors to be considered are the same as those considered when analyzing a medical source opinion, which can be found in 20 C.F.R. §§ 404.1527(d), 416.927(d).[9]

First and foremost, in the case at hand, in terms of opinion evidence, the ALJ was had no duty whatsoever to accord any weight to Ms. Maylone's testimony (which was given weight in the opinion section of the RFC analysis)

---

9. The factors an administrative law judge should take into account when analyzing a medical (and non-medical) source opinion include: the treatment relationship between the individual and the treating source, including the length, nature, extent, and frequency of examination; how consistent the medical opinion is with the record as a whole; and any other factors that tend to support or contradict the opinion. See 20 C.F.R. §§ 404.1527(d), 416.927(d).

because she did not render an *opinion* as to Plaintiff's limitations, but rather just described the treatment that Plaintiff had received. (Tr. 61-64). Plaintiff cites case law that holds that the ALJ has a duty to consider whether the objective medical evidence was consistent with the non-medical source's *opinion*. (Doc. 11, pp. 8-11). However, the flaw with this argument is that Ms. Maylone did not render an opinion, but rather provided factual medical evidence regarding Plaintiff's treatment. (Tr. 61-64). Therefore, the ALJ was under no duty whatsoever to accord Ms. Maylone's testimony any weight whatsoever, and was generous in even according some weight to it with the factor of the short duration of length and frequency of treatment of 20 C.F.R. §§ 404.1527(d), 416.927(d) taken into account as discussed in the RFC section. (Tr. 20).

Plaintiff also argues that the ALJ had a duty to provide specific reasons for rejecting Ms. Maylone's lay testimony and allegedly finding her not credible. (Doc. 11, pp. 8-11). An ALJ cannot reject evidence for an incorrect or unsupported reason. See Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993). However, it is clear that the ALJ did not outright reject Ms. Maylone's testimony nor did he find Ms. Maylone to be not credible as he provided her testimony with some weight, and Plaintiff's assertion is thus unsupported. (Tr. 20).

As such, the weight the ALJ afforded to Ms. Maylone's testimony is

19

supported by substantial evidence, and the ALJ's decision will not be disturbed on appeal based on this assertion.

### 2.   <u>Dr. Hardy's Opinion</u>

Plaintiff argues that the ALJ erred in: (1) giving no weight to Dr. Hardy's opinion that Plaintiff experienced episodes of decompensation one (1) to two (2) times per week; and (2) erred in giving some weight to the remainder of Dr. Hardy's opinion because as a treating physician his opinion was entitled to greater weight, because the ALJ failed to provide a sufficient explanation with evidence contradictory to Dr. Hardy's opinion, and because the ALJ failed to consider the factors of 20 C.F.R. § 404.1527(d) when analyzing Dr. Hardy's opinion.  (Doc. 11, pp. 14-20).[10]

First and foremost, Dr. Hardy did not opine that Plaintiff experienced one (1) to two (2) episodes of decompensation per week, but rather just generally that Plaintiff experienced one (1) to two (2) episodes of decompensation.  (Tr. 458).  If

---

10. To the extent that Plaintiff anticipates a counter argument from Defendant based on the great weight given to the GAF scores, this will not be addressed as it appears to be an anticipatory response from Defendant as opposed to an assertion made by Plaintiff.  Furthermore, even if Plaintiff is attempting to argue that the ALJ was not permitted to accord great weight to the GAF scores based on the SSA's more recent decision that GAF scores are not a reliable rating and can lead to improper assessment of impairment severity, this change in the SSA stance on GAF scores occurred in July of 2013, three (3) months after the ALJ issued her decision in April of 2013, and thus is not applicable to the ALJ's decision.

Dr. Hardy felt that Plaintiff experienced repeated episodes of decompensation, when asked how many episodes of decompensation Plaintiff experienced, he could have marked the box labeled "repeated (three or more)." (Tr. 458).

This Court now turns to Plaintiff's argument that the opinion of Dr. Hardy should have been given greater weight because he was Plaintiff's treating physician. The preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18. It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each

opinion. 20 C.F.R. § 416.927. The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record. See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961 (3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's RFC determination that the plaintiff could perform light work, even though this determination was based largely on the opinion of one medical expert, because the medical expert's opinion was supported by the medical evidence of record); Baker v. Astrue, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

Regardless, the ALJ has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an adequate explanation for the weight he gave to several medical opinions, remand was warranted). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." In re Moore v. Comm'r of Soc. Sec., 2012 U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)).

Regarding the relevant medical opinion evidence, the ALJ gave the following weight to the opinion of Dr. Hardy:

The undersigned has also considered the opinion of Dr. Hardy,

the claimant's psychiatrist, who opined May 2011, that the claimant is disabled from May 2011 to May 2012, can lift and carry 25 pounds, has moderate limitations in her activities of daily living and social functioning, often has limitations in her concentration, persistence and pace, has had 1-2 episodes of decompensation and has a GAF of 60-70 (Exhibit 21F). The undersigned finds that Dr. Hardy's opinion regarding the claimant's physical limitations is entitled to minimal weight, as it is outside her area of expertise as well as inconsistent with the unremarkable findings on the physical consultative examination and the claimant's own statements and testimony that she has no physical impairments which limit her ability to work. The remainder of Dr. Hardy's opinion, specifically regarding the claimant's mental functioning, is given some weight, but the undersigned finds instead that the claimant has only mild limits in her activities of daily living and has had no episodes of decompensation since her onset date, in light of the evidence of record.

(Tr. 19). Great weight was given to the medical providers' GAF scores ranging

from fifty-five (55) to seventy (70), little weight was afforded to the GAF scores

of twenty (20) to sixty (60) for the ones that were assigned before Plaintiff's

alleged onset date, minimal weight was afforded to the opinion of Dr. Tayour

because he was not a mental health specialist and his opinion was not supported

by treatment notes, and great weight was given to the DDS medical consultants,

"although the undersigned is minimally more restrictive and finds that the claimant

is further limited in her ability to work with supervisors." (Tr. 19-20).

Upon review of the entire record and the ALJ's RFC determination, it is

determined that the ALJ did not err in the weight he afforded to the opinion of Dr. Hardy because the ALJ sufficiently reasoned that, "in light of the evidence of record," "the claimant has only mild limits in her activities of daily living and has had no episodes of decompensation since her onset date." (Tr. 19). The ALJ extensively discussed the objective medical evidence in her decision, allowing this Court to conduct a meaningful review. See Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004) (holding that while an administrate law judge is required to set forth the reasons for his or her decision, and that a bare conclusory statement is insufficient to meet this requirement, an ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis. Rather, the function of Burnett is to ensure that there is sufficient development of the record and explanation of finding to permit meaningful review."); see also Diaz v. Commissioner of Social Security, 577 F.3d 500, 504 (3d Cir. 2009) ("In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements that a condition does not constitute the medical equivalent of a listed impairment are insufficient. The ALJ must provide a 'discussion of the evidence' and an 'explanation of reasoning' for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505, n.3 (3d Cir. 2004). The ALJ, of course, need not employ

24

particular 'magic' words: 'Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.' Jones, 364 F.3d at 505.").

In reading the decision as a whole and in reviewing the evidence, the ALJ's rejection of Dr. Hardy's opinion regarding the episodes of decompensation issue is sufficiently explained and supported because there simply was no evidence in the record whatsoever that Plaintiff experienced episodes of decompensation of extended duration during the time period in question. Furthermore, the ALJ provided plenty of discussion regarding Plaintiff's ability to perform activities of daily living that support the minimal weight he gave to this portion of Dr. Hardy's opinion. (Tr. 14-20).

Similarly, Plaintiff's argument that the ALJ did not take into consideration the factors of 20 C.F.R. § 404.1527(d)[11] also fails when reading the ALJ's decision as a whole. In her decision, the ALJ noted that Dr. Hardy treated Plaintiff from April 2010, two (2) months before her onset date, through May of 2011. (Tr. 17). The ALJ also noted that the examinations Dr. Hardy performed during visits over

---

11. The factors of 20 C.F.R. § 404.1527(d) include the length of treatment, the frequency of examination, the nature and extent of the treatment relationship, the supportability of and consistency with the record as a whole, and the specialization of the treating physician.

25

this time span reported that Plaintiff had a "good memory, bright affect, average intelligence, fluctuating mood, good insight and concentration and organized thought process . . . appropriate appearance, good eye contact, normal motor activity, coherent speech, an anxious mood, sad affect, fair attention span . . . appropriate thought content, was oriented to time, place, person and situation and had no hallucinations or delusions (Exhibit 13F/10-11)." (Tr. 17).  As such, given the presentation of this evidence in the decision, it is determined that the ALJ did in fact take the factors of  20 C.F.R. § 404.1527(d) into consideration in great detail, and simply because they were not discussed in the opinion section of the decision does not amount to error on the ALJ's part of the weight he assigned to Dr. Hardy's opinion.

As such, the ALJ's analysis of the medical opinion evidence is supported by substantial evidence and will not be disturbed on appeal.

### 3.   RFC Analysis

Plaintiff asserts that the ALJ's RFC analysis is not supported by substantial evidence due to the ALJ's failure to include all relevant limitations which resulted in an inaccurate hypothetical presented to the VE.  (Doc. 11, pp. 12-14).  More specifically, she argues that the ALJ failed to take into account that Plaintiff was attending a treatment program three (3) days a week, for six (6) hours a day, and

that the resulting RFC is thus flawed because this limitation prevents Plaintiff from engaging in a regular and continuous workweek in accordance with SSR 96-8p. (Doc. 11, pp. 12-14).

The burden is on the Plaintiff to prove disability, including presentation of evidence that can be used to evaluate her impairments and the effect they have on her ability to work. See 20 C.F.R. §§ 404.1512(a), 404.1545 (a)(3), 416.912(a), 416.945(a)(3); Sharts v. Astrue, 2012 U.S. Dist. LEXIS 103156, at *10 (M.D. Pa. Nov. 2, 2012) (Kosik, J.) (the Social Security Administration's regulations require that "an applicant for [DIB] and [SSI] come forward with medical evidence 'showing that [she] has an impairment(s) and how severe it is during the time [she] say[s] [she] is disabled.'").

However, in the case at hand, while Ms. Maylone testified that Plaintiff attended a treatment program three (3) days a week for six (6) hours a day, Plaintiff failed to support this testimony with objective medical evidence. Though the testimony provided by Ms. Maylone regarding this treatment plan was acknowledged by the ALJ, Plaintiff failed to provide the ALJ, and this Court, with objective medical evidence of record supporting Ms. Maylone's lay testimony. See Jones v. Commissioner of Social Security, 2012 U.S. Dist. LEXIS 53858, at *18-19 (D.N.J. Apr. 17, 2012) ("Plaintiff can point to no evidence that the ALJ

failed to consider suggesting that her treatments would interfere with work. The ALJ considered all of the relevant evidence, including lay testimony regarding the frequency and severity of Plaintiff's asthma attacks, and the descriptions provided of the necessity and nature of her treatments.  Plaintiff was required to prove at step four that her asthma precluded her from performing her past relevant work, and the ALJ reasonably found that the evidence did not meet this standard.").

Additionally, because there was no evidence supporting this limitation, the ALJ was under no duty to include this alleged limitation in the hypotheticals posed to the VE.  See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) (holding that as long as an administrative law judge's hypothetical includes all of a Plaintiff's limitations as supported by the record, the testimony of a vocational expert in response to a hypothetical constitutes substantial evidence for purposes of judicial review.).

As such, because Plaintiff failed to provide objective medical evidence in support of Ms. Maylone's testimony, the ALJ's RFC determination and the resulting hypotheticals posed to the VE are supported by substantial evidence and will not be disturbed on appeal.

### 4.   Recontacting Dr. Hardy

Plaintiff asserts that, "assuming *arguendo* the Court were to conclude that

the ALJ properly found ambiguities or conflicts between Dr. Hardy and the

evidence of record, the ALJ erred in that she did not properly resolve these

ambiguities or conflicts" in violation of SSR 96-8p and 20 C.F.R. §§ 404.1512(e)

and 416.912(e).  (Doc. 11, p. 20-21).

According to 20 C.F.R. §§ 404.1512(e) and 416.912(e):

> We will seek additional evidence or clarification from your
> medical source when the report from your medical source
> contains a conflict or ambiguity that must be resolved, the
> report does not contain all the necessary information, or does
> not appear to be based on medically acceptable clinical and
> laboratory diagnostic techniques.

20 C.F.R. §§ 404.1512(e) and 416.912(e).  The United States Court of Appeals for

the Third Circuit has interpreted this regulation to mean that an administrative law

judge will need to recontact a treating physician or order a consultative

examination only where the evidence is insufficient or inadequate for the ALJ to

make a determination regarding the claimant's disability.  Johnson v.

Commissioner of Social Security, 529 F.3d 198, 204-05 (3d Cir. 2008).  It is well-

established that recontact is permissive and not mandatory.  20 C.F.R. §§

404.1520b( c)(1), 416.920b( c)(1); see Moody v. Barnhart, 114 F. App'x 495, 501

(3d Cir. 2004) ("there was sufficient evidence in the medical records for the ALJ

to make her decision" and thus it was not necessary for the ALJ to recontact the

treating psychiatrist); see also Streeter v. Colvin, 2013 U.S. Dist. LEXIS 157076, at *12 (M.D. Pa. Oct. 31, 2013) (Nealon, J.).

In the case at hand, the record before the ALJ was adequate, contained all the necessary information, and did not contain a conflict or ambiguity that needed to be resolved. The fact that there was evidence contradicting Dr. Hardy's opinion did not amount to an insufficient or inadequate record that would require the ALJ to recontact Dr. Hardy. As such, substantial evidence supports the ALJ's decision and it will not be disturbed on appeal based on this assertion.

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be denied and the decision of the Commissioner will be affirmed.

A separate Order will be issued.

**Date**: March 2, 2016

/s/ William J. Nealon
**United States District Judge**